1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  SHAWN CURRAN,                    )   Civil No. 04cv1942-WQH (RBB)
                                     )
12             Petitioner,           )   **REPORT AND RECOMMENDATION RE:**
                                     )   **DENIAL OF PETITION FOR WRIT OF**
13  v.                               )   **HABEAS CORPUS [DOC. NO. 1]**
                                     )
14  JEANNE S. WOODFORD, Director,    )
                                     )
15             Respondent.           )
    _____   )

16

17      Petitioner Shawn Curran, a state prisoner proceeding pro se,

18  filed a Petition for Writ of Habeas Corpus [doc. no. 1] on

19  September 24, 2004.  Petitioner alleges that the trial court's

20  evidentiary rulings during the guilt phase of his bifurcated trial

21  deprived him of his Sixth and Fourteenth Amendment rights to

22  present evidence in support of his defense.  (Pet. 6.)  Curran

23  claims that on direct appeal, the state appellate court should have

24  applied the Chapman v. California, 386 U.S. 18 (1967), harmless

25  error standard to the trial court's exclusion of evidence because

26  the trial court's ruling deprived him of the best evidence

27  available to prove his state of mind at the time of the incident.

28  (Id.)

After reviewing the Petition, Respondent's Answer, and the Lodgments, this Court finds that Curran is not entitled to the relief requested and recommends that his Petition for Writ of Habeas Corpus be denied for the reasons outlined below.

## I. FACTUAL BACKGROUND

Shawn Curran worked for Brown Bulk Transportation as the driver of an eighteen-wheel truck and trailer weighing approximately fifteen tons. (Lodgment No. 18, Rep.'s Tr. vol. 8, 286-89, 294-95, 298, Sept. 12, 1997.) Brown Bulk Transportation (also known as J.B.T.) is a trucking company partially owned by Jeffrey Brown and his father. (Id. at 284-85, 295.) The company is located on the Pala Indian Reservation, next to the Pala Acorn Campground. (Id. at 295.)

Curran lived with his girlfriend, Nancy Hill (known as Nancy Wooten at the time of the incident), and his mother. (Lodgment No. 18, Rep.'s Tr. vol. 9, 348, 351-52, Sept. 15, 1997.) Petitioner and his girlfriend were methamphetamine users. (Id. at 353.) During the week of June 4, 1996, Curran and Nancy Hill moved into a camper located on the Pala Acorn Campground. (Id. at 351-52, 368-70.) A motorcycle rally involving two to three hundred bikers took place on the campground the same weekend they moved into the camper. (Id. at 368, 549-50.)

On Friday night, Petitioner and Hill used methamphetamine; then Curran asked Hill to go with him to put gas in the eighteen-wheeler, and she agreed. (Id. at 373-75.) After filling up the truck, Petitioner told Hill he was taking her to the top of Palomar Mountain because aliens from outer space were going to be there. (Id. at 373-74.) Curran drove erratically up the mountain, while

listening to the radio for messages from the aliens and warning
Hill that if she got out of the truck the aliens would kill her.
(<u>Id.</u> at 375.)  Curran drove Hill around for several hours Friday
night; they did not return to the campground until Saturday
morning.  (<u>Id.</u> at 378.)

When they returned, Hill went to take a shower.  (<u>Id.</u> at 380-
81.)  Petitioner followed her into the women's shower area and
screamed, "What's taking you so long?  Don't you know there's
bikers all over the place?"  (<u>Id.</u> at 382.)  He was concerned
something would happen to her while she was taking a shower.  (<u>Id.</u>
at 382-83.)

Later that day, Petitioner was driving erratically in the
truck yard; as a result, Jeffrey Brown fired Curran from his job.
(Lodgment No. 18, Rep.'s Tr. vol. 8, 305-08, 310.)  Curran told
Brown that living with Curran's mother had pushed him over the edge
and that he and his girlfriend wanted to stab her.  (<u>Id.</u> at 308.)
Brown testified that Curran appeared to be under the influence of
methamphetamine.  (<u>Id.</u> at 312-14.)  After retrieving his belongings
from the truck, Curran left the truck yard and walked back to the
campground.  (<u>Id.</u> at 309, 311.)  Petitioner was angry and told Hill
he was going to drive the truck until it was out of gas to get back
at Brown.  (Lodgment No. 18, Rep.'s Tr. vol. 9, 387.)

That evening, Curran repeatedly told Hill that somebody was
digging their graves and that the bikers were going to kill them.
(Lodgment No. 18, Rep.'s Tr. vol. 9, 394, 448-49, 462.)  At
approximately 11:00 p.m. that night, Cynthia Snow and her
girlfriend were coming out of the campground bathroom when Curran
referred to them as "more of Satan's play toys."  (<u>Id.</u> at 823.)

Earlier in the day, she saw Petitioner with a crescent wrench duct-taped to his right forearm.  (Lodgment No. 18, Rep.'s Tr. vol. 11, 829-30, Sept. 17, 1997.)  Curran told Maureen Buchanan, who was selling beer at the campground beer stand, that he was carrying the wrench and a mallet in case somebody tried to hurt him.  (Id. at 908-10.)  Buchanan refused to serve Curran beer because she thought he was high on methamphetamine and "out of control."  (Id. at 906-08; Lodgment No. 18, Rep.'s Tr. vol. 12, 1002-04, 1008-10, Sept. 18, 1997.)  She explained:  "[Y]ou have a certain way you act when you're under that, that kind of drug, and especially if you've been taking it for a long period of time.  You start losing, basically, your mind."  (Id.)

As part of the motorcycle rally, a bandstand was set up for live music performances.  Hill testified that except for sitting with Curran for ten minutes listening to the music, she stayed inside on Saturday night reading a book, and she never approached the bandstand.  (Lodgment No. 18, Rep.'s Tr. vol. 9, 398-99, 449.)  Other witnesses, however, saw her dancing near the bandstand and "flashing" her breasts to the band members.  (Lodgment No. 18, Rep.'s Tr. vol. 11, 826-27; Lodgment No. 18, Rep.'s Tr. vol. 12, 1072-74.)  A member of the band testified that he did not remember seeing any girls dancing suggestively or exposing their breasts that night.  (Lodgment No. 18, Rep.'s Tr. vol. 15, 1526-27, Sept. 23, 1997.)

A neighbor saw Curran walk to Brown's truck lot around 1:00 a.m.  (Lodgment No. 18, Rep.'s Tr. vol. 12, 1121-22.)  At the time, it was possible to drive directly from the J.B.T. truck lot to the campground because there were no fences or other barriers.

1   (Lodgment No. 18, Rep.'s Tr. vol. 8, 297; Lodgment No. 18, Rep.'s
2   Tr. vol. 11, 879.)  At about 1:35 a.m., Petitioner drove the
3   eighteen-wheel truck and trailer through the campground.  (Lodgment
4   No. 18, Rep.'s Tr. vol. 11, 832-34; Lodgment No. 18, Rep.'s Tr.
5   vol. 9, 568-69.)

6       As he began to veer off the dirt road, Curran nearly hit a
7   woman who managed to get out of the truck's way.  (Lodgment No. 18,
8   Rep.'s Tr. vol. 12, 1013-16, 1021; Lodgment No. 18, Rep.'s Tr. vol.
9   10, 605-06, Sept. 16, 1997.)  Petitioner managed to abruptly stop
10  the truck in front of another individual attending the biker rally,
11  preventing the truck from injuring him.  (Lodgment No. 18, Rep.'s
12  Tr. vol. 15, 1539-41, Sept. 23, 1997.)  Curran drove through the
13  campground, between a Quonset hut and the bandstand.  (Lodgment No.
14  18, Rep.'s Tr. vol. 12, 1013-16, 1021; Lodgment No. 18, Rep.'s Tr.
15  vol. 10, 605-06.)

16      Petitioner turned the truck and trailer around and headed
17  south, hitting some pickup trucks and a few motorcycles in the
18  process.  (Lodgment No. 18, Rep.'s Tr. vol. 10, 606-07; Lodgment
19  No.18, Rep.'s Tr. vol. 11, 834-38.)  The trailer ran over a dome
20  tent and into a tree.  (Lodgment No. 18, Rep.'s Tr. vol. 10, 607,
21  610; Lodgment No. 18, Rep.'s Tr. vol. 11, 833-34; Lodgment No. 18,
22  Rep.'s Tr. vol. 15, 1543.)  Jim Flannery was inside the tent and
23  suffered a crushed skull, killing him instantly.  (Lodgment No. 18,
24  Rep.'s Tr. vol. 8, 208-10.)

25      As Curran drove the truck through the campground, numerous
26  campers fired guns at him, trying to get him to stop.  (Lodgment
27  No. 18, Rep.'s  Tr. vol. 10, 604-05; Lodgment No. 18, Rep.'s Tr.
28  vol. 12, 1017-19.)  When the truck was later inspected, it had a

total of sixty-nine bullet holes.  (Lodgment No. 18, Rep.'s Tr. vol. 12, 963.)  Curran finally hit a tree, backed up, ran over more tents and a minivan, then he drove out of the campground. (Lodgment No. 18, Rep.'s Tr. vol. 10, 607-08.)

Deputy Sheriff Steven Spoelstra was on duty nearby and heard gunfire coming from the campground.  (Id. at 642.)  The deputy saw the truck knocking over telephone poles as it drove away from the campground.  (Id. at 643.)  He followed the truck for about a mile until it pulled off the road.  (Id. at 645-46.)  Curran had already left the truck by the time the officer inspected it.  (Id. at 651-52.)  The officer then contacted highway patrol, requested dog units, and sent another deputy to the campground to assess the situation.  (Id. at 652-53.)

At 5:00 a.m., Curran knocked on the door of Harold Byrd, a homeowner in the Pala area, and asked to use Byrd's phone to call his mother.  (Lodgment No. 18, Rep.'s Tr. vol. 11, 751-54.) Initially, Byrd called Petitioner's mother for him; but she wanted to speak to Curran, and Byrd agreed.  (Id. at 756-59, 762.)  Curran arranged to have his mother pick him up.  (Id. at 761-62.)

Byrd drove Petitioner to meet his mother at a nearby campground.  (Id. at 762.)  During the drive, Curran asked Byrd how old he was, what he did 2000 years ago, and what planet he was from.  (Id. at 767-68.)  Petitioner also started shaking and bouncing up and down in his seat.  (Id. at 768.)  Byrd dropped Curran off at the Four Seasons Campground at approximately 5:45 a.m. and drove home.  (Id. at 770-72.)

San Diego County Sheriff's Department deputies confronted Curran at the campground.  (Id. at 720-22.)  They ordered him to

the ground.  (<u>Id.</u> at 724.)  Curran eventually complied, but once on the ground, he resisted arrest and it took three officers to restrain and handcuff him.  (<u>Id.</u> at 724-28.)  Blood samples taken from the Petitioner at 8:58 a.m. on Sunday, June 9, 1996, were tested and contained concentrations of methamphetamine and amphetamine.  (Lodgment No. 18, Rep.'s Tr. vol. 8, 228-29.)  Dr. Jain, the prosecution's expert, testified that it would take two to three days to clear that amount of drugs from Curran's system.  (<u>Id.</u> at 235-36.)  At 9:21 a.m., Petitioner was interviewed by detectives with the sheriff's department, and a video of the interview was made.  (Lodgment No. 18, Rep.'s Tr. vol. 15, 146; <u>see</u> Lodgment No. 1, Clerk's Tr. vol. 2, 475-97, June 9, 1996.)

The prosecution presented evidence that Curran drove the truck through the campground out of jealousy over Hill's flirting and exposing herself to the band members.  (Lodgment No. 18, Rep.'s Tr. vol. 11, 891; Lodgment No. 18, Rep.'s Tr. vol. 17, 1750, 1761, 1764-65, Sept. 25, 1997.)  Defense counsel argued that James Flannery's death was "an unfortunate accidental death," and the prosecution did not prove its driven-by-jealousy theory.  (<u>Id.</u> at 1780, 1784, 1786.)  Curran's attorney maintained that Petitioner was under the influence of drugs and did not have the specific intent to commit the crimes charged.  (<u>Id.</u> at 1798-99.)

During the guilt phase portion of the trial, Curran relied on testimony from two psychiatrists and one psychologist.  The first expert, psychiatrist Charles Rabiner, examined Petitioner approximately sixteen days after the crime, while he was being held at the George Bailey Detention Center.  (Lodgment No. 18, Rep.'s Tr. vol. 14, 1239, 1243-44, 1246, Sept. 22, 1997.)  The interview

1   was not tape recorded.  (<u>Id.</u> at 1244, 1280.)  The trial court
2   allowed the expert to give his opinion that Curran was
3   hallucinating and suffering from delusions at the time of the
4   incident, but the court excluded any specific statements Petitioner
5   made to the psychiatrist as hearsay.  (<u>Id.</u> at 1249-52, 1262-63.)
6   Dr. Rabiner explained that Curran's delusions involved a belief
7   that people were trying to kill him.  (<u>Id.</u> at 1322.)  The
8   psychiatrist had reviewed Curran's taped interview with police, but
9   the court did not permit him to testify about specific statements
10  Curran made during that interview.  (<u>Id.</u> at 1253-54.)

11      Dr. Rabiner found that Petitioner's drug use on the night of
12  the crime was partly the cause of his hallucinations.  (Lodgment
13  No. 18, Rep.'s Tr. vol. 14, 1254-55.)  The expert testified Curran
14  suffered from bipolar disorder and was having a severe manic
15  episode on June 9, 1996.  (<u>Id.</u> at 1255-60, 1264.)  On cross-
16  examination, the prosecuting attorney asked Dr. Rabiner about a
17  report by a "jail psychiatrist" who interviewed Curran on the same
18  day as Dr. Rabiner but found no major mental illness,
19  hallucinations, or delusions.  (<u>Id.</u> at 1295-97.)

20      The defense presented a second psychiatrist, Dr. Nancy
21  McTigue.  (<u>Id.</u> at 1344.)  She interviewed Petitioner two months
22  after the incident.  (<u>Id.</u> at 1350, 1359.)  Dr. McTigue also
23  reviewed police reports and listened to Curran's audiotaped
24  interview with police when forming her opinion.  (<u>Id.</u> at 1351-
25  1354.)  The court precluded her from describing post-arrest
26  statements Curran made during his taped police interview, but she
27  was able to describe his disconnected thought process and paranoia
28  during the interview.  (<u>Id.</u> at 1351-56.)  Dr. McTigue also stated

that she observed fixed and paranoid delusions during her interview
with Petitioner and concluded that he was psychotic.  (Id. at 1360-
65.)  Again, the court excluded as hearsay the specific statements
Curran made to Dr. McTigue during that interview.  (Id.)

The third expert for the defense was Dr. Katherine
DiFrancesca, a psychologist, who interviewed the defendant ten days
after the incident.  (Lodgment No. 18, Rep.'s Tr. vol. 15, 1462,
1472, Sept. 23, 1997.)  The trial court sustained similar hearsay
objections during Dr. DiFrancesca's testimony, limiting her
description of Petitioner's delusions.  (Id. at 1470, 1474, 1480.)
Even so, she testified that Curran was "floridly psychotic" and
suffered from delusional and manic symptoms.  (Id. at 1467, 1478-
79.)

## II. PROCEDURAL BACKGROUND

Count one of the information charged Curran with murder and
alleged that he used a semi-truck as a deadly and dangerous weapon,
and he acted with the intent to inflict great bodily injury on
James Flannery in violation of California Penal Code section
187(a), section 12022(b), and section 1203.075.  (Lodgment No. 1,
Clerk's Tr., vol. 1, 1-2, June 12, 1996.)  Count two charged
Petitioner with gross vehicular manslaughter while intoxicated in
violation of California Penal Code section 191.5(a).  (Id. at 2.)
Count three charged Curran with assault with a deadly weapon and
with force likely to produce great bodily injury in violation of
California Penal Code section 245(a)(1) and section 1192.7(c)(23).
(Id. at 2.)  Finally, count four charged Petitioner with unlawful
driving or taking of a vehicle and further alleged one prior
serious felony conviction in violation of California Penal Code

9

section 10851(a), section 667(a)(b), and section 1192.7(c)(19). (<u>Id.</u> at 2-3.)

Curran pled not guilty by reason of insanity. (Lodgment No. 19, Rep.'s Tr. vol. 2, 1, Jan. 22, 1997.)  His trial was bifurcated into a guilt phase and a sanity phase. (<u>See</u> Lodgment No. 1, Clerk's Tr. vol. 3, 570, Sept. 29, 1997.)  After the guilt phase, the jury found Curran not guilty of first-degree murder but guilty of second-degree murder with a deadly weapon used with the intent to inflict great bodily injury. (Lodgment No. 1, Clerk's Tr. vol. 2, 285-86, Sept. 29, 1997.)  The jury also found Curran guilty of gross vehicular manslaughter, assault with a deadly weapon, and unlawful driving or taking of a vehicle. (<u>Id.</u> at 287-89.)

At the conclusion of the sanity phase, the jury found Petitioner sane when he committed all of the offenses. (Lodgment No. 1, Clerk's Tr. vol. 3, 576-77, Oct. 3, 1997.)  Curran waived jury trial on the prior allegations, and the trial judge found the alleged prison prior and strike conviction to be true. (<u>Id.</u> at 577-78; Lodgment No. 18, Rep.'s Tr. vol. 21, 2378, 2384, Oct. 3, 1997.)

On August 10, 1998, the trial court sentenced Curran to fifteen years imprisonment for second-degree murder, doubled to thirty years to life because of the strike conviction, with a concurrent term of six years for the auto theft charge. (Lodgment No. 1, Clerk's Tr. vol. 3, 528, 582, Aug. 10, 1998.)  The court stayed the sentences for the gross vehicular manslaughter and assault with great bodily injury convictions pursuant to California Penal Code section 654. (<u>Id.</u> at 528.)  The sentence included an additional five years for the prior serious felony and one year for

1 personal use of a deadly weapon.  (Id.)  Petitioner's prison term
2 totaled thirty-six years to life.  (Id.)

3      Curran filed an appeal in the California Court of Appeal
4 raising claims arising from the guilt, sanity, and sentencing
5 phases of his trial.  (Id. at 529, Aug. 13, 1998.)  Petitioner
6 asserted the trial court erred in the guilt phase by:  (1)
7 improperly excluding as hearsay statements Curran made in
8 psychiatric interviews and taped interviews with the police; (2)
9 admitting evidence of a prior assault; (3) denying a motion to
10 reduce his second-degree murder conviction to manslaughter; and (4)
11 failing to include a unanimity jury instruction on the assault
12 charge.  (Lodgment No. 2, Appellant's Opening Brief 23, 36, 46, 53,
13 People v. Curran, No. D031737 (Cal. Ct. App. Dec. 28, 1999).)
14 Petitioner claimed the trial court erred in the sanity phase by
15 denying his motion for continuance due to his counsel's illness and
16 by improperly excluding his statements in taped interviews as
17 hearsay.  (Id. at 57, 76.)  Curran also raised ineffective
18 assistance of counsel.  (Id. at 66.)  Finally, Petitioner claimed
19 the court erred at his sentencing hearing by finding a prior
20 serious felony and prior strike conviction based upon a robbery in
21 Missouri and by not staying the vehicle theft conviction.  (Id. at
22 79, 86.)

23      The California Court of Appeal affirmed Curran's second-degree
24 murder conviction and the driving or taking of a vehicle conviction
25 but struck the gross vehicular manslaughter conviction as a lesser
26 included offense of second-degree murder.  (Lodgment No. 5, People
27 v. Curran, No. D031737, slip op. at 3 (Cal. Ct. App. Dec. 28,
28 1999).)  The court reversed the assault conviction because the

trial court failed to give a unanimity jury instruction, and the appellate court stayed the sentence for the taking and driving of a vehicle conviction. (Id.)  It also ordered the sanity phase to be retried because the trial judge erred by refusing to admit the tape recording of Curran's interview with the deputy sheriffs.  (Id.)  The same result, however, was not required for the guilt phase of the trial.

The appellate court concluded that some of Petitioner's statements to his psychiatrists and to police were properly excluded as hearsay.  (Id. at 17.)  But other statements about his delusions were not hearsay because they provided circumstantial evidence of Curran's state of mind.  (Id. at 17-19.)  The court of appeal found that at the guilt phase, the trial court's error in excluding the statements did not rise to constitutional error, so it reviewed prejudice under the standard of People v. Watson, 46 Cal. 2d 818, 836, 299 P.2d 243, 254 (Cal. 1956), rather than the higher standard of Chapman v. California, 386 U.S. 18.  (Id. at 18-19.)  By applying the Watson standard, the court concluded that although prejudice resulted from the exclusion of the statements in the sanity phase, no prejudice occurred from the error in the guilt phase.  (Id. at 18-19, 33-34.)  The appellate court granted Petitioner a new sanity-phase trial, but he was not granted a new guilt-phase trial because Curran was not prejudiced by the guilt-phase errors.  (Id. at 20, 33.)

Curran raised the same issues in his petition for review to the California Supreme Court.  (Lodgment No. 6, Pet. for Review, People v. Curran, No. S085773 (Cal. Mar. 29, 2000).)  The court

summarily denied his petition on March 29, 2000.  (Lodgment No. 7, People v. Curran, No. S085773, slip op. at 1 (Cal. Mar. 29, 2000).)

The case was remanded to the superior court for a new sanity trial.  In October of 2001, Petitioner waived his right to a jury trial, and the court retried the issue of his sanity at the time of the offenses.  (Lodgment No. 8, Clerk's Tr. vol. 1, 86-87, Oct. 9, 2001, 129, Oct. 17, 2001.)  The court found Curran was legally sane when the crimes were committed in June of 1996.  (Id. at 140-41, Nov. 1, 2001.)

Petitioner appealed the decision to the California Court of Appeal, alleging that the trial court applied the incorrect legal standard for insanity and that the court's findings were contrary to the evidence.  (Lodgment No. 9, Appellant's Opening Brief 28, 38, People v. Curran, No. D039253 (Cal. Ct. App. Apr. 16, 2003).) The appellate court denied both of Curran's claims and affirmed his conviction.  (Lodgment No. 12, People v. Curran, No. D039253, slip op. at 11-12 (Cal. Ct. App. Apr. 16, 2003).)  Petitioner filed a petition for review in the California Supreme Court, which was denied on June 25, 2003.  (Lodgment No. 13, Pet. for Review at 1, People v. Curran, No. S115980 (Cal. June 25, 2003); Lodgment No. 14, People v. Curran, No. S115980, slip op. at 1 (Cal. June 25, 2003).)

Curran filed a Petition for Writ of Habeas Corpus [doc. no. 1] in this Court on September 24, 2004, claiming that the trial court deprived him of his constitutional right to present a defense by excluding evidence during the guilt phase of his trial.  (Pet. 6.) He also moved to hold his Petition in abeyance pending exhaustion

of related state claims.  (Id. at 12.)  The Court granted the
motion and stayed the case until May 31, 2005 [doc. no. 6].

Petitioner requested the stay be extended due to his
difficulties in accessing the law library and a change in his
mental medications [doc. no. 11].  The Court found good cause and
granted the request, staying the case until August 8, 2005 [doc.
no. 12].  Curran filed a combined Status Report and Request for
Stay and Abeyance on July 15, 2005 [doc. no. 16].  The Court
granted the request, staying the case until December 15, 2005 [doc.
no. 17].

Petitioner submitted a Motion for Order to Obtain Work Product
and another Request for Extension of Stay and Abeyance in December
2005 [doc. nos. 18, 19].  The Court denied his motion to obtain
work product but granted the stay and abeyance until April 30,
2006, noting that Curran must file a habeas petition in state court
before that date or proceed with his Petition on the one exhausted
claim [doc. no. 20].  Petitioner renewed his request to obtain work
product and filed another request for stay and abeyance in April
2006 [doc. no. 22].  The Court denied the motion for work product
but granted a third stay and abeyance, ordering the parties to
proceed with the single issue in the Petition on July 31, 2006, if
Curran failed to file an amended petition before that date [doc.
no. 24].

Curran did not file an amended petition.  Respondent was given
an extension of time to answer and filed her Answer to Petition for
Writ of Habeas Corpus [doc. no. 26] on October 17, 2006.  The Court
authorized Curran to file a Traverse by February 16, 2007 [doc. no.
28], but Petitioner did not submit a Traverse.

# III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C.A. § 2244 (West 2006), applies to all federal habeas petitions filed after April 24, 1996. Woodford v. Garceau, 538 U.S. 202, 204 (2003) (citing Lindh v. Murphy, 521 U.S. 320, 326 (1997)). AEDPA sets forth the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006); see also Reed v. Farley, 512 U.S. 339, 347 (1994); Hernandez v. Ylst, 930 F.2d 714, 719 (9th Cir. 1991). Because Curran filed his Petition on September 24, 2004, AEDPA applies to this case. See Woodford, 538 U.S. at 204.

In 1996, Congress "worked substantial changes to the law of habeas corpus." Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997). Amended § 2254(d) now reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West 2006).

To present a cognizable federal habeas corpus claim, a state prisoner must allege that his conviction was obtained "in violation of the Constitution or laws or treaties of the United States." See 28 U.S.C. § 2254(a). Petitioner must allege that the state court violated his federal constitutional rights. See Reed, 512 U.S. at 347; Hernandez, 930 F.2d at 719; Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990).

A federal district court does "not sit as a 'super' state supreme court" with general supervisory authority over the proper application of state law. Smith v. McCotter, 786 F.2d 697, 700 (5th Cir. 1986); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (holding that federal habeas courts must respect a state court's application of state law); Jackson, 921 F.2d at 885 (concluding that federal courts have no authority to review a state's application of its law). Federal courts may grant habeas relief only to correct errors of federal constitutional magnitude. Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989) (stating that federal courts are not concerned with errors of state law unless they rise to the level of a constitutional violation).

The Supreme Court, in Lockyer v. Andrade, 538 U.S. 63 (2003), stated that "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) -- whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law." Id. at 71 (citation omitted). In other words, a federal court is not required to review the state court decision de novo. Id. Rather, a federal court can proceed directly to the reasonableness analysis under § 2254(d)(1). Id.

The "novelty" in § 2254(d)(1) is "the reference to 'Federal law, <u>as determined by the Supreme Court of the United States</u>.'" <u>Lindh v. Murphy</u>, 96 F.3d 856, 869 (7th Cir. 1996) (en banc), <u>rev'd on other grounds</u>, 521 U.S. 320 (1997) (emphasis added).  Section 2254(d)(1) "explicitly identifies only the Supreme Court as the font of 'clearly established' rules." <u>Id.</u>  "[A] state court decision may not be overturned on habeas corpus review, for example, because of a conflict with Ninth Circuit-based law." <u>Moore</u>, 108 F.3d at 264.  "[A] writ may issue only when the state court decision is 'contrary to, or involved an unreasonable application of,' an authoritative decision of the Supreme Court." <u>Id.</u>; <u>see also</u> <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996); <u>Childress v. Johnson</u>, 103 F.3d 1221, 1225 (5th Cir. 1997); <u>Devin v. DeTella</u>, 101 F.3d 1206, 1208 (7th Cir. 1996).

Furthermore, with respect to the factual findings of the trial court, AEDPA provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C.A. § 2254(e)(1) (West 2006).

## IV. DISCUSSION

Curran claims his right under the Sixth and Fourteenth Amendments to present a defense was violated during the guilt phase of his trial when the trial court excluded his statements to the mental health experts and a taped interview with police.  (Pet. 6.) The California Court of Appeal found the exclusion of the evidence was error, but after applying <u>People v. Watson</u>, 46 Cal. 2d 818, 299

P.2d 243, the court determined the error was not prejudicial because there was no reasonable probability that the jury would have returned a more favorable verdict if the evidence had been introduced.  (Lodgment No. 5, <u>People v. Curran</u>, No. D031737, slip op. at 19.)  Petitioner contends the trial court committed constitutional error, so the appellate court should have applied the <u>Chapman v. California</u>, 386 U.S. 18, harmless error test.  (Pet. 6.)

The trial court prevented Petitioner's experts from testifying about statements Curran made during his psychiatric examinations and during his taped interview with police.  (Lodgment No. 18, Rep.'s Tr. vol. 14, 1249-54, 1262-63, 1360-64; Lodgment No. 18, Rep.'s Tr. vol. 15, 1470, 1474, 1480.)  The first expert, psychiatrist Charles Rabiner, reviewed Curran's taped interview with police, but he was not permitted to testify about the content of any of Petitioner's statements.  (Lodgment No. 18, Rep.'s Tr. vol. 14, 1253-54.)  The court told the doctor:  "You can't get into what [Curran] told you."  (<u>Id.</u> at 1263.)  Similar rulings prevented Dr. McTigue and Dr. DiFrancesca from testifying about the delusions they observed during their interviews with Curran.  (Lodgment No. 18, Rep.'s Tr. vol. 14, 1360-64; Lodgment No. 18, Rep.'s Tr. vol. 15, 1470, 1474, 1480.)

The California Court of Appeal examined the taped police interview and concluded that some of Petitioner's statements should have been admitted.  (Lodgment No. 5, <u>People v. Curran</u>, No. D031737, slip op. at 15-18.)  It found that the trial court's decision to exclude evidence was an error of state law, subject to the <u>People v. Watson</u> prejudice test.  (<u>Id.</u> at 19); see <u>People v.</u>

1  _Guiton_, 4 Cal. 4th 1116, 1130, 847 P.2d 45, 53, 17 Cal. Rptr. 2d

2  365, 373 (Cal. 1993).

3      According to state law, Curran's statements to police that he

4  thought the motorcycle group members were demons, that the bikers

5  were evil, communicated telepathically, and that he had died many

6  times, were circumstantial evidence of his state of mind and not

7  hearsay.  (Lodgment No. 5, _People v. Curran_, No. D031737, slip. op.

8  at 17-19; _see_ Lodgment No. 1, Clerk's Tr. vol. 2, 478-79, 481-82,

9  484, 493.)  The court of appeal concluded that the trial court

10  erred under California law by excluding these and similar

11  statements Curran made to the mental health experts.  (Lodgment No.

12  5, _People v. Curran_, No. D031737, slip. op. at 18.)  But the error

13  did not rise to the level of a constitutional violation by

14  depriving Curran of his due process right to present his defense.

15  (_Id._ at 18-19.)

16      "[I]t is not the province of a federal habeas court to

17  reexamine state-court determinations on state-law questions.  In

18  conducting habeas review, a federal court is limited to deciding

19  whether a conviction violated the Constitution, laws, or treaties

20  of the United States."  _Estelle v. McGuire_, 502 U.S. 62, 68 (1991)

21  (citing 28 U.S.C. § 2241; _Rose v. Hodges_, 423 U.S. 19, 21 (1975)).

22  This Court must determine whether the state appellate court's

23  finding of no constitutional error and subsequent decision to apply

24  the _Watson_ prejudice standard was contrary to, or an unreasonable

25  application of, clearly established federal law.  (Pet. 6); 28

26  U.S.C. § 2254(d).  Curran contends "the [trial court's] error

27  raised constitutional concerns," and thus, reversal was required

28

19                              04cv1942-WQH(RBB)

under <u>Chapman</u> unless the error was harmless beyond a reasonable doubt.  (Pet. 6); <u>see</u> <u>Chapman</u>, 386 U.S. at 24.

"Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." <u>Tinsley v. Borg</u>, 895 F.2d 520, 530 (9th Cir. 1990) (quoting <u>Lincoln v. Sunn</u>, 807 F.2d 805, 816 (9th Cir. 1987)).  In order to warrant habeas relief, an incorrect state ruling "must be so prejudicial as to jeopardize the defendant's due process rights." <u>Id.</u> (citing <u>Miller v. Stagner</u>, 757 F.2d 988, 994 (9th Cir. 1985), <u>amended on other grounds</u>, 768 F.2d 1090 (9th Cir. 1985)).  Due process requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense." <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984).  Under federal law, "when a hearsay statement bears persuasive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation." <u>Chia v. Cambra</u>, 360 F.3d 997, 1003 (9th Cir. 2004) (citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973)).

In deciding "whether the exclusion of evidence in the trial court violated petitioner's due process rights," the Court must balance the state's interest in excluding the evidence against the importance of the evidence to the defense. <u>Chia</u>, <u>id</u>.  The state has an interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable evidence. <u>Id.</u> (citing <u>Miller</u>, 757 F.2d at 994).  The federal courts do not question "the power of States to exclude evidence through the application of evidentiary rules that themselves serve interests of fairness and reliability -- even if the defendant would prefer to see that

evidence admitted." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (citing <u>Chambers</u>, 410 U.S. at 302).  On the other hand, a defendant's right to present a defense is a fundamental constitutional right.  <u>Chia</u>, 360 F.3d at 1004 (citing <u>Perry v. Rushen</u>, 713 F.2d 1447, 1450-51 (9th Cir. 1983)).  Due process requires the defendant have a fair opportunity to defend against the state's accusations.  <u>Id.</u> at 1003 (citing <u>Chambers</u>, 410 U.S. at 294).

To determine whether a habeas petitioner's due process right to present a defense was violated by the exclusion of evidence, the Court must balance the state interest against Petitioner's due process rights, applying five factors:  (1) the "probative value of the evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." <u>Miller</u>, 757 F.2d at 994.  The stronger the state interest, the more critical, reliable, and highly probative the excluded evidence must be in order to violate due process.  <u>Perry</u>, 713 F.2d at 1452.  "A defendant must show that his interest clearly outweighs the state's before [a federal court] will interfere with routine [state] procedural matters."  <u>Id.</u> at 1453.  The federal court must place the competing interests on the scales and ultimately decide whether the state court's decision to exclude the evidence was unreasonable.  <u>Chia</u>, 360 F.3d at 1004.

Curran's mental condition was in dispute during the guilt phase of the trial.  Indeed, he pled not guilty by reason of insanity.  (Lodgment No. 19, Rep.'s Tr. vol. 2, 1.)  Petitioner

wanted the jury to find that he could not have formed the intent
necessary to commit murder.  His specific statements to police and
mental health experts would have been relevant to the issue because
they would have provided information about Curran's mental state at
the time of the crime.  The probative value of the excluded
evidence, therefore, weighs in favor of the Petitioner.

The interview with police was taped, and thus the tape would
provide a reliable representation of Curran's statements.
(Lodgment No. 1, Clerk's Tr. vol. 2, 474-97.)  Curran's out-of-
court statements to his psychiatrists and psychologist were not
recorded, but they carry some indicia of reliability.  One, the
statements were fairly detailed.  Two, Curran made substantially
similar statements to the three mental health professionals and the
deputy sheriffs.  Three, Nancy Hill testified about similar
statements made by Petitioner before the incident.  (Lodgment No.
18, Rep.'s Tr. vol. 9, 373-75, 394, 448-49, 462.)  The statements,
however, are not susceptible to easy evaluation by the trier of
fact.  The prosecution and defense counsel both called expert
witnesses who evaluated Curran's out-of-court statements in
reaching their opinions.  The second and third <u>Miller</u> factors do
not support the admission of the statements.

The fourth factor weighs heavily in favor of a finding that
Petitioner was not deprived of due process.  Evidence which is
merely cumulative or of little probative value "will almost never
outweigh the state interest in efficient judicial process." <u>Id.</u> at
1453.  <u>Perry</u>, 713 F.2d at 1453.  Other evidence relating to
Petitioner's mental state, aside from the police interview
statements and statements made to Curran's psychiatrists and

psychologist, was admitted at trial.  His specific statements would have been cumulative of evidence actually presented.  These statements were not the only source for determining Curran's mental state.

All three defense experts testified about their conclusions that Curran was psychotic at the time of the incident.  (Lodgment No. 18, Rep.'s Tr. vol. 14, 1255-60, 1264, 1360-65; Lodgment No. 18, Rep.'s Tr. vol. 15, 1467, 1478-79.)  The jury also heard expert testimony that Petitioner suffered from delusions and hallucinations.  (Lodgment No. 18, Rep.'s Tr. vol. 14, 1249-52, 1262-63, 1360-65.)  Dr. Rabiner explained that Curran's delusions resulted from a belief that people were trying to kill him.  (Id. at 1322.)  Dr. McTigue described how Petitioner's police interview revealed paranoia and a disconnected thought process.  (Id. at 1352-56.)  The trial court instructed the jury to consider the evidence of Curran's mental disease, mental disorder, or mental defect in deciding whether he had the required specific intent, premeditated, or deliberated.  (Lodgment No. 18, Rep.'s Tr. vol. 17, 1834-35.)

In addition to the expert testimony, other witnesses testified about Curran's delusions.  Nancy Hill told the jury that while he was listening to messages from the aliens from outer space on the radio, Petitioner drove her up Palomar Mountain to meet with them. (Lodgment No. 18, Rep.'s Tr. vol. 9, 373-75.)  She also testified that Curran told her many times that somebody was digging their graves and that the bikers were going to kill them.  (Id. at 448-49.)  Byrd, the man who drove Petitioner to the Four Seasons Campground the morning after the crime, testified that Curran asked

how old he was, what he did 2000 years ago, and what planet he was from.  (Lodgment No. 18, Rep.'s Tr. vol. 11, 767-79.)  Other witnesses noticed a crescent wrench taped to Petitioner's arm, which he carried in case somebody tried to hurt him.  (Id. at 908-10, Sept. 17, 1997.)  This testimony, coupled with the experts' conclusions, provided the jury with ample evidence of Curran's delusions.  The jury was made aware of Petitioner's paranoia that others were trying to kill him and his belief in aliens, even without hearing Curran's specific interview statements.  Petitioner's statements, if admitted, would have been cumulative of evidence already presented.

Finally, Curran's out-of-court statements did not constitute a major part of his defense.  His mental state was put before the jury through the testimony of his experts and others.  Furthermore, Petitioner's counsel also argued that the death was "an unfortunate accidental death."  (Lodgment No. 18, Rep.'s Tr. vol. 17, 1780.)

The California Court of Appeal concluded Curran was able to present a defense because "[h]is experts testified that he was psychotic and suffered delusions, hallucinations and paranoia at the time of the incident."  (Lodgment No. 5, People v. Curran, No. D031737, slip op. at 18-19 (Cal. Ct. App. Dec. 30, 1999).)  The defense was able to present evidence that Curran suffered from a mental disorder, so the exclusion of his statements did not interfere with Petitioner's right to present a defense.  (Id. at 19.)

A petitioner must present unusually compelling circumstances to outweigh the strong state interest in administration of its trials.  Perry, 713 F.2d at 1453.  For example, in Chambers v.

1   <u>Mississippi</u> the Court found a violation of due process because an
2   excluded statement was trustworthy and indicated that someone other
3   than the defendant committed the crime.   <u>Chambers</u>, 410 U.S. at 288,
4   302.   Similarly, in <u>Chia v. Cambra</u>, an accomplice told police that
5   the defendant was not involved in the crime and tried to talk him
6   out of going through with the plan.   <u>Chia</u>, 360 F.3d at 1001.   In
7   these cases, the excluded evidence would have exonerated the
8   defendant of the primary offense, and there were no other avenues
9   to prove the defendants' stories.   <u>See</u> <u>Perry</u>, 713 F.2d at 1452.

10      Here, Petitioner was able to present three expert witnesses
11  who examined him and concluded that he was mentally ill.   The
12  experts were allowed to testify that Curran was paranoid and afraid
13  that someone was trying to kill him.   The hearsay evidence
14  overlapped other testimony at trial about the defendant's paranoia
15  and delusions.   The specific statements in the mental health and
16  police interviews, although graphic, were not critical to Curran's
17  defense that he lacked the requisite intent.   The nature of his
18  delusions was admitted through other testimony.   The exclusion of
19  the evidence did not deprive Petitioner of his due process rights.

20      Therefore, the California Court of Appeal's finding that
21  Curran's constitutional right to present a defense was not violated
22  was not contrary to, nor did it involve an unreasonable application
23  of, clearly established federal law.   Accordingly, Curran's
24  Petition should be DENIED.

25                          **V. CONCLUSION**

26      For the above reasons, the district court should **DENY** Curran's
27  Petition for Writ of Habeas Corpus.

28

1    This Report and Recommendation will be submitted to the United
2 States District Court Judge assigned to this case, pursuant to the
3 provisions of 28 U.S.C. § 636(b)(1).  Any party may file written
4 objections with the district court and serve a copy on all parties
5 on or before June 18, 2007.  The document should be captioned
6 "Objections to Report and Recommendation."  Any reply to the
7 objections shall be served and filed on or before June 29, 2007.
8 The parties are advised that failure to file objections within the
9 specified time may waive the right to appeal the district court's
10 order.  Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

11

12 DATED:  May 17, 2007

                                    Ruben B. Brooks
13                                  United States Magistrate Judge

14 cc:  Judge Hayes
         All Parties of Record